# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| THOMAS FRANCHINI, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Docket no. 1:18-cv-00015-GZS ) |
| BANGOR PUBLISHING CO. INC. et al., | ) ) ) |
| Defendants. | ) |

**ORDER ON PENDING DISPOSITIVE MOTIONS**

Before the Court are a number of Motions filed by the various Defendants in this case including: Investor's Business Daily, Inc.'s Motion to Dismiss for Failure to State a Claim and Special Motion to Dismiss (ECF No. 17); MTM Acquisition, Inc. and Edward Murphy's Motion to Dismiss for Failure to State a Claim (ECF No. 18); Gannett Company, Inc. and Donovan Slack's Motion for Judgment on the Pleadings (ECF No. 24); and Bangor Publishing Company, Inc. and Meg Haskell's Motion for Judgment on the Pleadings (ECF No. 26). As explained herein, the Court GRANTS IN PART and DENIES IN PART all of these Motions.

**I.      LEGAL STANDARD**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In making this determination, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the nonmovant's favor. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). "If the factual allegations in the complaint are

too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (internal quotation marks omitted) (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)); see also Iqbal, 556 U.S. at 678 (stating that courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). The moving party bears the burden of demonstrating that the complaint fails to state a claim. Lamprey v. Wells Fargo Home Mortg., No. 2:16-cv-00570-JDL, 2017 WL 3470570, at *2 (D. Me. Aug. 11, 2017) (citing 5B Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 1357 (3d ed. 2017 Update)).

The standard for a motion for judgment on the pleadings is the same as a motion to dismiss under Rule 12(b)(6). Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012). In ruling on both types of motions, the Court may "consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'" Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)). The Court may give similar consideration to "documents . . . incorporated into the movant's pleadings." Id. (citing Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998)).

## II. FACTUAL BACKGROUND

Plaintiff Thomas Franchini ("Franchini") is a board-certified podiatrist living in East Greenwhich, Rhode Island, who has been practicing medicine for twenty-seven years. This case arises from four news articles discussing Franchini's work as a podiatrist with the Department of

2

Veterans Affairs at the VA Maine Healthcare System at Togus, in Augusta, Maine ("VA Togus").[1] Franchini worked at VA Togus between 2004 and 2010. Franchini began his career as a surgical podiatrist with the United States Navy in 1992.[2] From 2002 to 2003, Franchini worked as a clinical professor at the Fletcher Allen Medical Center in Burlington, Vermont. Franchini conducted or participated in approximately 4,900 surgeries prior to 2004 "without any tort claim or claim of sub-standard care or performance against him." (Am. Compl. ¶¶ 14, 16.)

After joining the medical staff at VA Togus, Franchini performed approximately 580 surgeries as part of that employment. Simultaneous to his association with VA Togus, Franchini worked at Maine Medical Center and Mercy Hospital in Portland, Maine. For these latter two employers, Franchini performed approximately ninety-five surgeries "without any tort claim or claim of sub-standard care or performance against him." (Id. ¶ 20.) Around April 2010, VA Togus reviewed Franchini's note-taking and preparation of medical records, criticized him for "the brevity of his procedure notes," and asked him to cease performing surgeries. (Id. ¶ 21.) Franchini later resigned from VA Togus on November 8, 2010. At that time, the only investigation pending against Franchini was related to his notes. Then, between 2010 and 2011, VA Togus "raised issues" with twenty-five procedures Franchini performed or participated in. (Id. ¶ 24.) However, a group of independent podiatrists reviewed these procedures and found them to be appropriate. Since 2012, VA Togus and its representatives have accused Franchini of numerous instances of

---

[1] Although Plaintiff did not attach any of these articles to his Amended Complaint, Defendants have attached three of them—those published by MTM Acquisition, Inc. and Edward Murphy, Gannett Company, Inc. and Donovan Slack, and Investor's Business Daily, Inc.—to their various motions. See MTM Acquisition, Inc. and Edward Murphy's Ex. A (ECF No. 18-1); Gannett Company, Inc. and Donovan Slack's Ex. A (ECF No. 24-1); Investor's Business Daily, Inc.'s Ex. 2 (ECF No. 17-2). Given that these articles are "absolutely central" to Plaintiff's claims, and that their authenticity is undisputed, the Court considers them merged with the pleadings. Fudge v. Penthouse Intern., Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988); see Curran, 509 F.3d at 44.

[2] Franchini was honorably discharged in 2008 but spent his last six years of service as a reservist.

sub-standard performance from his time there. Franchini, an experienced physician, claims that all such allegations are "false" and "baseless." (Id. ¶ 27.)

Beginning in October 2017, a number of media outlets and journalists published articles discussing the VA's allegations about Franchini "without conducting appropriate inquiry or investigation." (Id. ¶ 28.) First, on October 1, 2017, MTM Acquisition, Inc. and Edward Murphy (together, "MTM Defendants") published an article in the *Portland Press Herald* entitled "Maine Veterans Given Substandard Care are Told It's Too Late to Sue." (Id. ¶ 38.) The article begins by discussing a number of lawsuits against the VA in which veterans describe alleged ailments they have suffered from since being treated by Franchini. (MTM Defendants' Ex. A (ECF No. 18-1), PageID # 149-150.) It then notes that "Franchini is still a licensed podiatrist, even though he resigned from the VA after the agency told him to step down or he would be fired in early 2010, according to . . . a spokesman for the VA." (Id. PageID # 151.)

On October 11, 2017, Gannett Company, Inc. and Donovan Slack (together, "Gannett Defendants") published an article in *USAToday* entitled "VA Conceals Shoddy Care and Health Workers' Mistakes." (Id. ¶ 44.) In that article, Slack wrote that "[i]n 88 cases, the VA concluded that Franchini made mistakes that harmed veterans" and that "[a]gency leaders didn't fire Franchini or report him . . . they let him quietly resign." (Gannett Defendants' Ex. A (ECF No. 24-1), PageID # 177.) Slack also wrote that "Franchini had resigned while under investigation . . . . and VA officials had been examining hundreds of his former patients' cases" as well as that "the VA placed Franchini on leave after finding problems with a small sample of his cases." (Id. PageID # 178.) Then, on October 27, 2017, Bangor Publishing Company, Inc. and Meg Haskell (together, "Bangor Defendants") published an article entitled "Vet Harmed at Togus." (Am. Compl. ¶ 32.) Therein, according to the Amended Complaint, Haskell wrote that the VA "forced"

4

Franchini out, "88 vets . . . suffered under the care of . . . Franchini," Franchini had "botched" certain procedures performed on Jim Barrows, and that Franchini had subsequently "realized" that he made an error/errors. (Id. ¶ 33.)

Lastly, on December 22, 2017, Investor's Business Daily, Inc. ("IBD") and Sally Pipes published an article entitled "VA Negligence is Killing Veterans" in the *Investor's Business Daily*. (Id. ¶ 50.) In the article, Pipes wrote that "Franchini botched 88 procedures" and "severed a patient's tendon during one surgery and failed to successfully fuse one woman's ankle in another." (IBD's Ex. 2 (ECF No. 17-2), PageID # 122). She continued that "Franchini wasn't fired for any of these errors. Instead, the VA allowed him to resign and return to private practice." (Id.)

In his Amended Complaint, Franchini alleges that all the just-quoted statements "expressly and implicitly misstated the content" of the "reportage" upon which they were purportedly based, and that they are all false. (Am. Compl. ¶¶ 34, 40, 46, 52.) He claims both presumed damages and actual damages.

### III. DISCUSSION

All Defendants join in raising multiple arguments for the dismissal of Plaintiff's defamation claims (Counts I, II, III, and IV) and negligent infliction of emotional distress claims (Count VI). The Gannett Defendants have also raised arguments for dismissal of Plaintiff's negligent and fraudulent misrepresentation claims (Count V). Lastly, IBD moves to dismiss pursuant to Maine's Anti-SLAPP statute, 14 M.R.S.A. § 556. The Court addresses each of these bases for dismissal in turn.

#### A. Defamation (Counts I-IV)

In Maine, the basic elements of a defamation claim are: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting

5

at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Cole v. Chandler, 752 A.2d 1189, 1193 (Me. 2000). Defendants' arguments for dismissal of Plaintiff's defamation claims fall into three basic categories: (1) Plaintiff is constitutionally required to plausibly allege actual malice but has failed to do so; (2) Plaintiff fails to isolate actionable statements by Defendants because the statements he claims to be defamatory are either substantially true or opinions; (3) various privileges protect Defendants' publications. The Court considers each of these arguments in turn.

   1. **Actual malice**

Due to the inherent free speech implications of defamation actions, the federal constitution imposes various "requirements . . . independent of those established by the state's own law." Veilleux v. Nat'l Broadcasting Co., 206 F.3d 92, 108 (1st Cir. 2000). For example, where a court determines that the plaintiff is a public official or public figure, or that the speech at issue addresses a matter of public concern, the constitutional actual malice standard comes into play.[3] To establish actual malice, the plaintiff must show that the speaker made the allegedly defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). Defendants first assert that the actual malice standard applies here because Plaintiff is a public official or limited public figure.

In general, public officials are those individuals who hold the kind of public office "with 'substantial responsibility for or control over the conduct of governmental affairs.'" Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 202 (1st Cir. 2006) (quoting Rosenblatt v. Baer, 383 U.S. 75,

---

[3] In cases brought by public officials or public figures, plaintiffs must plead and prove actual malice as a pre-requisite to any recovery. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974). In cases brought by private figures as to speech addressing matters of public concern, plaintiffs must show actual malice to the extent they seek to recover presumed or punitive damages. Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997).

6

85 (1966)). In determining public official status, courts take into account: "(i) the extent to which the inherent attributes of a position define it as one of influence over issues of public importance; (ii) the position's special access to the media as a means of self-help; and (iii) the risk of diminished privacy assumed upon taking the position." Id. at 204. Limited public figures, on the other hand, need not be public employees. Id. at 202. This status attaches where "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 351 (1974) (noting also that "instances of truly involuntary public figures must be exceedingly rare"). To establish the requisite public controversy, "it must be shown that persons were actually discussing some specific question" prior to the alleged defamation. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011) (internal citations and quotations omitted).

As these principles make clear, "status determinations . . . are inescapably fact-specific." Mandel, 456 F.3d at 204. In this case, the relevant parts of the factual record are limited at this point in the litigation. See id. (quoting Miller v. Transam. Press, Inc. 621 F.2d 721, 724 (5th Cir. 1980)) (explaining that "there are cases in which 'it may not be possible to resolve the [public-figure] issue until trial'"). As a result, the Court concludes that the record is not developed enough at this stage to support a determination that Plaintiff is a public official or limited public figure.

Defendants alternatively argue that the actual malice standard applies because Plaintiff's alleged defamatory statements involve matters of public concern. Matters of public concern are "those that can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 132 (1st Cir. 1997) (quoting Connick v. Myers, 461 U.S. 138, 146-147 (1983)). In analyzing whether a statement addresses such a concern, a court must examine the statement's "content, form, and context . . . as

revealed by the whole record." Dun & Broadstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985) (internal quotation marks omitted) (quoting Connick, 461 U.S. at 147-148). To come within the "public concern hemisphere" the "relevant community need not be very large and the relevant concern need not be of paramount importance or national scope." Levinsky's, 127 F.3d at 132. "Rather, 'it is sufficient that the speech concern matters in which even a relatively small segment of the general public *might* be interested.'" Id. (emphasis added) (quoting Roe v. City of San Francisco, 109 F.3d 578, 585 (9th Cir. 1997)).

Here, the statements at issue clearly meet the "broad" Levinsky's standard and relate to matters of public concern. Veilleux v. Nat'l Broad. Co., Inc., 8 F. Supp. 2d 23, 34 (D. Me. 1998). When the allegedly defamatory statements are evaluated for content, form, and context, in light of the entire record, it becomes clear that they are not related merely to matters of private concern, but raise serious issues about the healthcare being provided at VA Togus. Dun & Broadstreet, Inc., 472 U.S. at 761. The public no doubt has a significant interest in such matters. See Levinsky's, 127 F.3d at 132 ("criticism of the workings of government is at the core of conduct protected by the First Amendment"); see also Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006) (holding that doctor's "speech raising concerns on the state of healthcare at [a government] facility addressed matters of public concern").

Having concluded that the publications at issue relate to matters of public concern, the Court examines Plaintiff's Amended Complaint for plausible allegations of actual malice. To plead actual malice, a plaintiff must present facts sufficient to allow, at the very least, a plausible inference that the speaker "entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). Simply put, Plaintiff has not presented facts permitting such an inference here. This conclusion does not sound the death knell for a defamation claim by

a private figure, like Plaintiff, to the extent he seeks actual damages. See Mangual v. Rotger-Sabat, 317 F.3d 45, 66 (1st Cir. 2003). However, it does foreclose Plaintiff from recovering presumed or punitive damages.[4] Levinsky's, 127 F.3d at 128. Additionally, any common-law presumption of falsity disappears, and Plaintiff ultimately bears the burden of proving falsity. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986).

### 2. Actionable Statements

Defendants next argue that: (1) the allegedly defamatory statements are substantially true and, therefore, unactionable; and, (2) alternatively, the statements constitute opinion and are not provable as false. Plaintiff identifies precise statements he considers defamatory from each of the four publications at issue in his Amended Complaint.[5] The identified statements relate to the circumstances of his departure from VA Togus and whether he made surgical mistakes or otherwise provided sub-standard care to certain patients while working at VA Togus.

Generally, "[a] communication is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" Bakal v. Weare, 583 A.2d 1028, 1029 (Me. 1990) (quoting Restatement (Second) of Torts § 559 (1977)). In assessing whether a statement fits this definition,

---

[4] In Plaintiff's prayer for relief, he includes a request for punitive damages as to the Gannett Defendants. It is not clear whether this request is tied to Count III, Count V, or both. However, the Court's above finding as to actual malice precludes an award of punitive damages on Count III.

[5] See Am. Compl. ¶¶ 33, 39, 45 & 50. The Court notes that of all the statements contained in the just-cited paragraphs, one stands out as insufficiently pleaded. With respect to the MTM Defendants, the Amended Complaint asserts, "[t]he article stated that Franchini had performed in a substandard or negligent fashion with respect to certain procedure(s) performed or participated in respecting April Wood, Kenneth Myrick, Timothy Mansir, and Mark Prescott and others and/or that the VA had so determined." Am. Compl. ¶ 39. This assertion does not adequately identify specific statements in the article that Plaintiff believes convey this message. The Court does not foreclose the possibility that Plaintiff might later be allowed to amend his operative complaint to identify the specific statements he is referring to. At this point, however, Count II survives only as to Plaintiff's allegation that the MTM Defendants defamed him related to the statement that he was told to "step down or he would be fired" in 2010. MTM Defendants' Ex. A, PageID #151; see Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 728 n.6 (1st Cir. 1992) (noting that "a defendant is entitled to knowledge of the precise language challenged as defamatory").

9

"the statement must be interpreted in its context, which includes the entire publication and all extrinsic circumstances known to the recipient." Schoff v. York Cty., 761 A.2d 869, 871 n.3 (Me. 2000). Under Maine law, "one who repeats a defamatory statement may be as liable as the original defamer." Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc., 804 F.3d 59, 64 (1st Cir. 2015) (citing Restatement (Second) of Torts § 578). "[I]t would otherwise be too easy for a writer or publisher to defame freely by repeating the defamation of others and defending it as simply an accurate report of what someone else had said." Gray v. St. Martin's Press, Inc., 221 F.3d 243, 250 (1st Cir. 2000) (citing Restatement (Second) of Torts § 578). In the Court's view, Plaintiff has identified statements related to each defamation count which, when read in context, harm his reputation enough to be considered defamatory.[6]

To be actionable in defamation, a statement must also include "an assertion of fact, either explicit or implied" that is "false." Lester v. Powers, 596 A.2d 65, 69 (Me. 1991). "Falsity 'overlooks minor inaccuracies and concentrates upon substantial truth.'" Veilleux, 206 F.3d at 108 (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991)). "A statement is not false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" Id. (quoting Masson, 501 U.S. at 517). The question, in other words, is "whether the 'allegedly false facts' about a plaintiff are 'variants of the true' and so do not 'paint him in a worse light.'" Atl. Ne. Rails & Ports, Inc., 804 F.3d at 65 (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1229 (7th Cir. 1993)). "Merely couching a statement as an

---

[6] The one exception is the Bangor Defendants' statement that the VA "forced" Plaintiff out, which even if inaccurate, is not by itself defamatory. Am. Compl. ¶ 33. As the Law Court has explained, "[t]he mere fact of one's removal from office carries no imputation of dishonesty or lack of professional capacity. It is only when the publication contains an insinuation that the dismissal was for some misconduct that it becomes defamatory." Picard v. Brennan, 307 A.2d 833, 836 (Me. 1973) (internal citations and quotations omitted); see also Pan Am Sys., Inc. v. Hardenbergh, 871 F. Supp. 2d 6, 16 (D. Me. 2012) (applying reasoning outside slander per se context). Absent the context of the Bangor Defendants' article, the Court cannot discern whether this statement implies that the VA acted based on perceived misconduct. Similar statements from the other articles, indicating that the VA took disciplinary actions against Plaintiff, all imply that the VA acted in part because Plaintiff provided sub-standard care.

opinion . . . will not automatically shield the speaker from liability where the statement implies the existence of underlying defamatory facts." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19 (1990)). However, as the First Circuit has noted, "a statement cannot be defamatory if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." Id. (internal citations and quotations omitted).

Here, according to Plaintiff's version of events, he voluntarily resigned from his position at VA Togus. At the time of his resignation, he had not been placed on leave and was not under any sort of investigation for providing sub-standard care. Moreover, Plaintiff maintains that the VA's accusations of treatment mistakes are false. The allegedly defamatory statements in the articles present more than mere semantic differences from Plaintiff's account. See McCullough v. Visiting Nurse Serv. of S. Me., 691 A.2d 1201, 1204 (Me. 1997) (finding statement that the plaintiff had been terminated for "several incidents" to be substantially true, if not technically accurate, where the plaintiff had been fired for two incidents). Read in context, several the statements "paint" him in a "worse light" by suggesting that VA Togus took disciplinary action against him for providing sub-standard treatment.[7] Atl. Ne. Rails & Ports, Inc., 804 F.3d at 65. Being fired, disciplined, or forced out of a job for this kind of misconduct is indisputably worse than resigning for personal reasons only to have one's conduct later questioned. Additionally, the

---

[7] This category includes the statements that: "the agency told him to step down or he would be fired," in the MTM Defendants' article; "[a]gency leaders didn't fire Franchini or report him . . . they let him quietly resign," "Franchini had resigned while under investigation . . . and VA officials had been examining hundreds of his former patients' cases," and "the VA placed Franchini on leave after finding problems with a small sample of his cases" in the Gannett Defendants' article; and "Franchini wasn't fired for any of these errors. Instead, the VA allowed him to resign and return to private practice" in the IBD article. MTM Defendants' Ex. A, PageID # 151; Gannett Defendants' Ex. A, PageID # 177-178; IBD's Ex. 2, PageID # 122.

11

statements suggesting that Plaintiff somehow harmed his patients make him look much worse than the pleaded facts do.[8]  Id.

The Court also concludes that none of the well-pleaded statements constitute unactionable opinion. "To say 'I think' is not enough to turn fact into opinion." Gray, 221 F.3d at 248. "Rather, the cases are likely to protect a statement as 'opinion' where it involves expressions of personal judgment, especially as the judgments become more vague and subjective in character." Gray, 221 F.3d at 248; see Levinsky's, 127 F.3d at 130 (holding that invective "trashy" is too subjective to be factual). Here, viewed in context, none of the properly identified statements express such vague or subjective judgments, but present or imply the existence of objective, verifiable facts.

### 3. Privileged Communications

Defendants additionally argue that Plaintiff's claims fail because certain privileges apply to the allegedly defamatory statements. Specifically, they contend that: (1) the common-law "fair report" and conditional privileges protect the statements; and (2) a constitutional "fair report" privilege for judicial proceedings immunizes them.

At the threshold, the Maine Supreme Judicial Court has never recognized a common-law privilege for "fair report." Pan Am Sys., Inc. v. Hardenbergh, 871 F. Supp. 2d 6, 15 (D. Me. 2012). In other jurisdictions, such as Massachusetts, this privilege immunizes "publishers who 'fairly and accurately report certain types of official or governmental action.'" Id. (quoting Yohe v. Nugent, 321 F. 3d 35, 42 (1st Cir. 2003)). However, this Court declines to reshape Maine law by bestowing such a privilege. See id. The Court reaches a similar conclusion as to the conditional

---

[8] This category includes the statements that: "[i]n 88 cases, the VA concluded that Franchini made mistakes that harmed veterans" in the Gannett Defendants' article; "88 vets . . . suffered under the care of . . . Franchini," Franchini had "botched" certain procedures performed on Jim Barrows, and Franchini had subsequently "realized" that he made an error/errors, in the Bangor Defendants' article; and "Franchini botched 88 procedures," and "severed a patient's tendon during one surgery and failed to successfully fuse one woman's ankle in another," in the IBD article. Gannett Defendants' Ex. A, PageID # 177; Am Compl. ¶33; IBD's Ex. 2, PageID # 122.

privilege. As Defendants briefly discuss, Maine law recognizes a conditional privilege where "an important interest of the recipient of a defamatory statement will be furthered by frank communication." Lester, 596 A.2d at 70. However, as far as the Court can tell, the Law Court has rarely applied this privilege outside of the employment context, and has never directly addressed whether it applies to general news reporting. See, e.g., Morgan v. Kooistra, 941 A.2d 447, 456 (Me. 2008) (employment disciplinary proceedings); Cole, 752 A.2d at 1193-1194 (employment termination); McCullough, 691 A.2d at 1204 (employment termination); Lester, 596 A.2d at 70 (college tenure review); Onat v. Penobscot Bay Med. Ctr., 574 A.2d 872, 874 (Me. 1990) (medical peer review); Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989) (college tenure review). At least at this early stage of the litigation, the Court cannot definitively conclude that the conditional privilege attaches to these allegedly defamatory statements.

Defendants also contend, relying primarily on the Supreme Court's decision in Cox Broadcasting Corp. v. Cohn, that: (1) the First Amendment creates a "fair report" privilege for fair and accurate reports of judicial proceedings; and (2) the articles constituted such fair and accurate reports immunizing them from suit. 420 U.S. 469 (1975). Cox involved a news broadcast in which a reporter stated a rape and murder victim's name during a report recounting the events of criminal court proceedings. Id. at 473-474. The victim's father sued, and the Georgia Supreme Court eventually held that his complaint stated an actionable claim in tort. Id. at 474-475. The Supreme Court reversed and articulated the limited holding that: a state may not "impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records." Id. at 491.

Cox does not apply under the circumstances. Here, unlike in Cox, there is no evidence in the current record indicating that any of the allegedly actionable statements were actually based

13

on information obtained from public judicial records.  See id. at 472 n.3 (citing journalist's statements in record appendix indicating that he had obtained the information for the broadcast by attending trial and viewing indictments).  There is no testimony from any of the Defendants discussing the bases for the allegedly defamatory statements, nor do the statements themselves—or even context clues from the articles—indicate that they were pulled from or based on judicial records.[9]  Thus, given the limited pre-discovery record before it, the Court cannot conclude that Cox applies to the allegedly defamatory statements.

### B. Negligent Infliction of Emotional Distress (Count VI) ("NIED")

Plaintiff also alleges negligent infliction of emotional distress against all Defendants.  There appear to be two factual predicates underlying these claims: (1) the defamatory articles caused Plaintiff emotional distress; and (2) the Gannett Defendants' misrepresentation caused Plaintiff emotional distress.  As Defendants point out, the facts as pleaded do not support separate claims for negligent infliction of emotional distress.

Under Maine law, emotional distress claims cannot be premised solely on allegedly defamatory statements.  Veilleux, 206 F.3d at 129 (citing Rippett v. Bemis, 672 A.2d 82, 87-88 (Me. 1996)).  Thus, to the extent Plaintiff bases his NIED claims on statements in Defendants' various articles, such claims are subsumed into his defamation claims.  See id.

The only possible exception to this conclusion is Plaintiff's NIED claim premised on the Gannett Defendants' misrepresentation.  However, this claim fails as a matter of law for two separate reasons.  First, to allow emotional distress recovery based on misrepresentation would

---

[9] The MTM Defendants' Motion even appears to admit that their assertion that the VA told Plaintiff to "step down or he would be fired" was based on a spokesperson's statement and not a charge from a judicial proceeding.  MTM Defendants' Ex. A, PageID # 151; see MTM Defendants' Mot., PageID # 138.  Even assuming some of the allegedly defamatory statements bear resemblance to statements made as part of other judicial proceedings before this District, as Defendants argue, the Court cannot infer that any of the articles were based on those statements at this Rule 12 stage.

render meaningless Maine's rule that misrepresentation torts only permit the recovery of pecuniary damages. See id. at 130. Second, Maine only permits recovery for negligent infliction of emotional distress where the defendant has a "special duty of care." Id. The First Circuit, interpreting Maine law, has explicitly held that journalists do not owe their subjects a special duty. Id. at 131. Therefore, the Court GRANTS Defendants' Motions as to Count VI.

### C. Negligent and Fraudulent Misrepresentation (Count V)

As noted above, in Count V, Plaintiff asserts claims of negligent and fraudulent representation against the Gannett Defendants only. Specifically, he alleges that he agreed to be interviewed for the Gannett Defendants' article on the condition that they would not identify the location of his then-current employment in their publication. He also alleges that: the Gannett Defendants represented their agreement to this condition before and during the interview; that he relied on these representations; that the representations were false; and that the article ultimately included the location of his employment. Construing the Amended Complaint in the light most favorable to Plaintiff, the Court also reads it as alleging that Plaintiff's employer later terminated him, thereby causing him pecuniary harm, because the article disclosed the location of that employment. The Gannett Defendants contend that these claims should be dismissed because Plaintiff has not adequately pleaded proximate causation.

To plead claims for negligent and fraudulent misrepresentation, a plaintiff must present facts demonstrating, among other things, that the defendant made a "false representation of present fact," and that the Plaintiff incurred pecuniary harm because of justifiable reliance on that false representation. Packgen v. BP Expl. and Prod., Inc., 957 F. Supp. 2d 58, 84 (D. Me. 2013) (quoting Berry v. Worldwide Language Res., 716 F. Supp. 2d 34, 48 (D. Me. 2010)); see Veilleux, 206 F.3d at 123. For purposes of this Motion only, the Gannett Defendants do not argue that

Plaintiff failed to plead a false representation of present fact in support of these claims. (See Gannett Defendants' Mot., PageID # 173.) Rather, citing Veilleux v. National Broadcasting Co., they contend that Plaintiff has not alleged the requisite causal nexus between the misrepresentation and his pecuniary loss. 203 F.3d at 125. In Veilleux, the First Circuit explained that, in Maine, "the proper measure of damages for a misrepresentation claim is plaintiff's lost bargain." Id. Here, that means Plaintiff must establish that his pecuniary loss was caused by the difference between the represented publication (no employment location) and the actual publication (with employment location). See id. The Court reads Plaintiff's Amended Complaint as pleading this type of pecuniary loss. Recognizing that "[p]roximate cause is generally a question for the jury," the Court concludes that dismissal is at this stage is unwarranted and DENIES the Gannett Defendants' Motion as to these claims to the extent Plaintiff seeks actual pecuniary damages.[10] Id.

### D. IBD's Special Motion to Dismiss

IBD also separately moves to dismiss Plaintiff's defamation claim against it under 14 M.R.S.A. § 556, Maine's anti-SLAPP statute (Strategic Lawsuits Against Public Participation). To succeed on such a motion, the moving party must initially demonstrate that "the activity that is the subject of the litigation constitutes petitioning activity." Gaudette v. Davis, 160 A.3d 1190, 1196 (Me. 2017). Here, IBD has failed to meet this burden.

Maine's anti-SLAPP statute "is designed to guard against meritless lawsuits brought with the intention of chilling or deterring the free exercise of the defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs." Schelling v. Lindell, 942 A.2d 1226, 1229 (Me. 2008). The statute permits dismissal of an action "only if the

---

[10] To the extent Plaintiff seeks punitive damages on this claim, the Court concludes that Plaintiff has not pleaded facts demonstrating that the Gannett Defendants acted with common-law "malice." Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me. 1985) (outlining common-law malice standard). Thus, the Court GRANTS the Gannett Defendants' Motion as to punitive damages.

activity the plaintiff complains of constitutes 'petitioning activity.'" Gaudette v. Mainely Media, Inc., 160 A.3d 538, 542 (Me. 2017). The statute defines such activity as:

> any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

14 M.R.S.A. § 556. In Gaudette v. Mainely Media, the Law Court explained that "Maine's anti–SLAPP statute is not applicable to newspaper articles unless those articles constitute the newspaper petitioning *on its own behalf* or the party seeking to invoke the anti–SLAPP statute is a party that used the newspaper to broadcast the party's own petitioning activities." 160 A.3d at 543 (emphasis added). The Law Court then concluded that where "the newspaper was documenting current events" and did not express its own views as to how the government should address those events, it was not engaging in petitioning activity. Id. In the instant case, the Court reaches the same conclusion as to IBD.

The article at issue here is essentially a news report recounting recent failings at the VA and does not articulate any of IBD's views. Thus, the Court does not interpret the article as IBD petitioning on its *own* behalf. Whether it could be read as Pipes engaging in petitioning activity is irrelevant at present because Pipes is not the party invoking the statute.[11] The Special Motion to Dismiss pursuant to 14 M.R.S.A. § 556 is, therefore, DENIED. To the extent IBD argues that California's Anti-SLAPP statute should apply under Maine's choice-of-law rules, the record is not

---

[11] The Court notes that, in coming to this conclusion, it has considered the declarations of Sally Pipes and Chris Gessel, which IBD submitted with its Motion. IBD Ex. 1 (ECF No. 17-1); IBD Ex. 4 (ECF No. 17-4). None of the assertions therein convince the Court that this specific article constituted petitioning activity on behalf of IBD.

sufficiently developed for the Court to make such a determination. See Federal Ins. Co. v. XTRA Intermodal, Inc., No. 14-cv-14010-ADB, at *7 (D. Mass. July 7, 2015) (declining to address choice-of-law issue, in part, because the court lacked "the benefit of a fully developed factual record on this point").

## IV. CONCLUSION

Based on the foregoing, the Court GRANTS IN PART and DENIES IN PART the Motions to Dismiss (ECF Nos. 17 & 18) and the Motions for Judgment on the Pleadings (ECF Nos. 24 & 26).[12] The Motions are GRANTED to the extent that the Court finds all Defendants are entitled to judgment as a matter of law as to Count VI and the requests for presumed damages in Counts I, II, III, & IV. Additionally, the Court concludes that the Gannett Defendants are entitled to judgment as a matter of law on Plaintiff's request for punitive damages. As to all other claims and requests for damages, the Motions are DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of March, 2019.

---

[12] Plaintiff closes his 67-page opposition to Defendants' Motions with a one-paragraph plea that he should be granted leave to amend citing the "liberal standard of Rule 15(a)." Pl. Response (ECF No. 41), PageID # 267. He does not attach any amended pleading or otherwise disclose what additional facts he might plead in connection with this request. To the extent this Order dismisses Plaintiff's claims for presumed damages under Counts I-IV, his claims for punitive damages against the Gannett Defendants, and Count VI, the Court concludes any amendment would be futile. To the extent Plaintiff's request to amend pertains to other aspects of the remaining counts, the request to amend is denied without prejudice to Plaintiff renewing his request with an attached proposed amended complaint for the Court's review.