# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

THOMAS FRANCHINI,            )
                                       )
           Plaintiff,         )
                                       )
v.                                 )    Docket no. 1:18-cv-00015-GZS
                                       )
BANGOR PUBLISHING CO., INC., et al.,    )
                                       )
           Defendants.     )
                                       )

## ORDER ON JOINT MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' Joint Motion for Summary Judgment (ECF No. 138). Via this Motion, Defendants ask the Court to answer a threshold legal question relating to Counts I–IV of Plaintiff's Amended Complaint (ECF No. 6). Having reviewed the Motion and the related submissions filed by the parties (ECF Nos. 132–37, 141–45, 147–48, 159, 161), the Court GRANTS IN PART and DENIES IN PART the Motion.

## I.    PROCEDURAL BACKGROUND

To put the pending motion in its proper context, the Court begins with a brief recitation of the procedural history of this matter. In early 2018, Plaintiff Thomas Franchini filed the present action against four publishers and four reporters, alleging defamation, negligent infliction of emotional distress, and negligent or fraudulent misrepresentation. (See generally Am. Compl. (ECF No. 6).) Defendants subsequently moved to dismiss and/or for judgment on the pleadings. (See Defs. Mots. (ECF Nos. 17, 18, 24, 26).) In March 2019, the Court granted these motions in part and denied them in part. See generally Franchini v. Bangor Publ'g Co., 383 F. Supp. 3d 50 (D. Me. 2019). Franchini's claim for negligent infliction of emotional distress (Count VI) was dismissed, and his claim for negligent or fraudulent misrepresentation (Count V) was limited to

actual pecuniary damages.  See id. at 63–64.  To the extent that one Defendant, Investor's Business Daily, Inc. ("IBD"), sought dismissal under Maine's anti-SLAPP statute, the Court denied this request.[1]  See id. at 64–65.

As to the defamation claims (Counts I–IV), the Court held that (1) Franchini had not pleaded facts allowing for an inference of actual malice; and (2) the serious issues Defendants' articles raised about the healthcare being provided at the VA Maine Healthcare System at Togus ("VA Togus" or "Togus") were of public concern.  Id. at 59–60.  These holdings foreclosed punitive damages and any common-law presumption of falsity.  However, Franchini's claims for actual damages survived, as the undeveloped record did not allow the Court to then determine whether "Plaintiff [was] a public official or limited public figure."  Id. at 59.

Following this decision, discovery in this matter was bifurcated.[2]  (See 10/9/19 Endorsement Order (ECF No. 92).)  In Phase I, which has now concluded, discovery was limited to the threshold issue of Plaintiff's "status as a public official or limited purpose public figure." (Id.)  In December 2020, all remaining Defendants jointly filed the present motion for summary judgment on this threshold issue.

## II.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence is

---

[1] IBD filed an interlocutory appeal of the Court's denial of relief under the anti-SLAPP statute.  See Notice of Appeal (ECF No. 58).  The First Circuit has in turn certified a question to the Maine Law Court.  See Franchini v. Investor's Bus. Daily, Inc., 981 F.3d 1 (1st Cir. 2020).  Pending resolution of the interlocutory appeal, the Court granted IBD's motion to stay proceedings between Franchini and IBD.  See Order (ECF No. 66).  To date, no terms of the stay have been excepted or suspended.

[2] Following this bifurcation, Plaintiff sought to again amend his complaint, but the Court denied this request to amend. See 4/15/20 Orders (ECF Nos. 112 & 113).

such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (cleaned up); see also Fed. R. Civ. P. 56(e).  "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (cleaned up).  "When determining if a genuine dispute of material fact exists, [courts] look to all of the record materials on file, including the pleadings, depositions, and affidavits without evaluating the credibility of witnesses or weighing the evidence." Taite, 999 F.3d at 93 (cleaned up).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b).  This local rule further requires each statement of material

fact to be "followed by a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citations to supporting evidence. D. Me. Loc. R. 56(c). Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f).

## III.  FACTUAL BACKGROUND[3]

### A.  The Public Controversy Regarding the Availability of Quality Care through the Department of Veterans Affairs[4]

The U.S. Department of Veterans Affairs ("VA") is charged with administering "the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. § 301. For decades, controversy has shrouded the VA's efforts to complete this mission as it relates to medical care. See, e.g., Paul G. Shekelle et al., Comparison of Quality of Care in VA and Non-VA Settings: A Systematic Review ("Comparison Study"), at iv (September 2010) (available at https://www.hsrd.research.va.gov/publications/esp/quality.pdf) ("The quality of care provided by the VA has been subject to debate since, and well before, the

---

[3] The Court notes that both sides have asked the Court to strike many of their opponent's statements of material fact. See Defs. Reply SMF (ECF No. 148), PageID #s 3320–49; Pl. Am. Response SMF (ECF No. 159), PageID #s 3399–422. With limited exceptions explicitly discussed herein, the Court finds it unnecessary to address each of these requests individually. Rather, the Court has reviewed all of the cited exhibits and has disregarded any statement of fact that is not properly supported by admissible evidence in the record currently before the Court, as it is obliged to do. See D. Me. Loc. R. 56(f).

[4] In framing this summary of the controversy, the Court draws not only from the materials cited in the summary judgment record, but also takes judicial notice of other published news reports from the relevant time periods. See F.R.E. 201(b) & (c)(1); see also Benak ex rel. All. Premier Growth Fund v. Alliance Cap. Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006) (courts may "take judicial notice of newspaper articles for the fact of their publication").

VA's system transformation starting in the mid-90s. Media and entertainment vehicles have, rightly or wrongly, not infrequently portrayed VA care in less than optimal light . . . .").[5]

In Maine, in particular, the in-state availability of quality medical care through the VA has long been the subject of public concern and discussion.  In 2004, the VA estimated that it had approximately 36,000 veterans seeking care in Maine.  (R. 437.)[6]  A vigorous public discussion centered on the limited availability of quality care at VA Togus caused by a confluence of increasing patient numbers, reduced staffing, and delays in treatment.[7]  This controversy echoed a larger national discussion[8] that also featured an anxiety over the quality of care provided once an appointment was obtained.  See generally Comparison Study.[9]

As reflected in the record before the Court, on March 10, 2004, Tom Allen, then one of Maine's two U.S. Representatives,  spoke of "the crisis facing VA health care" and noted how veterans in Maine faced particular challenges obtaining care from "Maine's single VA hospital, Togus." (R. 424–25.)   In August 2005, the U.S. House of Representative's Committee on Veterans' Affairs' Subcommittee on Health ("Health Subcommittee") convened in Maine and

---

[5] This study, cited by Defendants, reviewed more than 200 articles that the VA identified as comparing care in VA and non-VA settings.  See Defs. SMF (ECF No. 138-1), PageID # 3174.

[6] The Court follows the parties' lead and refers to the Joint Stipulated Record (ECF Nos. 132–37) by the page numbers provided therein (e.g., R. ##).

[7] See, e.g., Doug Kesseli, Veterans Seek Service Improvements, Bangor Daily News, May 15, 2004, at C1; Josie Huang, For Veterans, Health Care on Hold; VA Staffing Shortages, Limited Space and a Spike in Enrollment Force Many to Wait a Year for a First Exam., Portland Press Herald, Jan. 19, 2003, at 1B; VA's Uneven Health, Bangor Daily News, March 19, 2002, at A8; Michael O'D. Moore, Doctors, Veterans Voice Medical Care Concerns, Bangor Daily News, Aug. 3, 2000; Bill Nemitz, For Some Veterans, The Battles Go On, Portland Press Herald, May 30, 1999; Paul Kane, Hearing Reveals Togus Problems, Bangor Daily News, Sept. 26, 1998.

[8] See, e.g., Susannah Rosenblatt, VA Health System Failing, Survey Says, L.A. Times, July 15, 2003, at 18; Alice Dembner, Many Face Long Wait for Care from VA; Economics Create a Swamped System, Bos. Globe, Jan. 27, 2003; Milt Freudenheim, V.A. Health Care Strained by Big Wave of Enrollees, N.Y. Times, Apr. 6, 2002, at A1; David Stout, Bush Promises Help to Veterans Who Face Health-Care Backlog, N.Y. Times, Aug. 20, 2001.

[9] See also, e.g., Robert Pear, Report Outlines Medical Errors in V.A. Hospitals, N.Y. Times, Dec. 19, 1999, at 1; Associated Press, Rating Group Finds Veterans' Hospitals Lagging in Quality, N.Y. Times, June 4, 1990, at A21.

discussed, *inter alia*, "what challenges the VA confronts in providing care for veterans in [Maine.]" Among the issues remarked upon were short staffing and significant delays in orthopedic care.  (R. 426, 431, 438, 449.)  Likewise, at an October 3, 2007 hearing before the U.S. Senate Special Committee on Aging, Senator Susan Collins also spoke of the challenges the VA faced providing care to veterans in Maine.  (R. 673–74.)

Jumping ahead to the 2010s, the public conversation over VA care continued both nationally and in Maine.  (See R. 771–74; 923–26.)[10]  In January 2015, for instance, the Health Subcommittee convened a hearing titled, "Examining the Quality and Cost of VA Healthcare." (R. 775–846; see, e.g., R. 828 (prepared statement recognizing "there is much debate underway about the quality of care being delivered at VA medical facilities around the country").)[11]  As it related to VA Togus in particular, the concern was heightened by allegations of medical malpractice.[12]  In November 2017, the House Committee on Veterans' Affairs Subcommittee on Oversight and Investigations convened a hearing titled, "Examining VA's Failure to Address Provider Quality and Safety Concerns."  Kenneth Myrick, a veteran and former VA Togus patient who had sued the VA for malpractice, had a statement read into the record describing the care he received.  (R. 1106.)  Additionally, then-U.S. Representative Bruce Poliquin of Maine expressed concern about mismanagement of malpractice allegations at VA Togus.  (R. 1072–73.)  He

---

[10] See also, e.g., Charles Eichacker, Veterans Look Ahead to a Future with Trump; Some Mainers Say Trump Is the Right Choice for Improving their Care after Problems Rocked the VA, Portland Press Herald, Nov. 13, 2016, at 2B; Michael Shepherd, Pingree: VA Should Fire Contractor Managing Troubled Care Program, Bangor Daily News, Apr. 28, 2016; Michael Shepherd, Many Maine Veterans Still Waiting for Timely Health Care, Bangor Daily News, Jan. 28, 2016; Michael Shepherd, Watchdog Ties Togus to National VA Scandal; Federal Report: Some Seeking Mental Health Care Have Had Trouble Getting Appointments or Have Endured Long Waits, Portland Press Herald, June 18, 2015, at 1A; Michael Shepherd, New Togus Patients Wait Longer, Morning Sentinel (Waterville, Me.), May 16, 2014.

[11] Additional legislative hearings were held in April and September 2016.  See R. 847–922; R. 927–1048; see, e.g., R. 892 (prepared statement of VA Undersecretary for Health David Shulkin, stating:  "The year 2014 was one of the most significant times in VA's history. To say that we had a crisis on our hands would be an understatement.").

[12] See infra III.C (discussing seven federal cases involving VA Togus).

specifically noted allegations against Dr. Thomas Franchini, who had treated Myrick.  (<u>See</u> R. 1072–73, 1083–84 ("Thomas Franchini.  Make sure everybody knows who he is.").)

### B.  Dr. Franchini's Tenure at the VA

Dr. Franchini, a board-certified foot and ankle surgeon, began his career as a surgical podiatrist with the United States Navy in August 1992.  (Defs. Reply SMF (ECF No. 148), PageID #s 3320–21; <u>see generally</u> R. 146–50.)  Franchini served as an active-duty officer through August 2002, after which time he served six additional years in the United States Naval Reserve. (<u>Id.</u>)  During his naval career, he attained the rank of lieutenant commander, received multiple awards and commendations, and participated in more than 4,800 surgeries.  (<u>Id.</u>)  From 2002 to 2003, Franchini served as a clinical professor at Fletcher Allen Medical Center in Vermont.  (Defs. Reply SMF, PageID # 3322.)

In April 2004, Franchini joined VA Togus as Chief of the Department of Podiatry.  (Stip. Facts (ECF No. 138-2), PageID # 3182; R. 10.)  He sought employment with the VA "[b]ecause of the honor," as well as to improve his "retirement scenario."  (R. 43.)  Upon his employment, Franchini, then 39 years old, became one of three podiatrists employed at VA Togus.  (R. 13, 44.) The other podiatrists were "a lot older" (R. 44) and were paid at the higher GS-15, Step 10 rate, whereas Franchini started at GS-14 (R. 20).  The department also included a podiatry technician and a scheduling clerk shared with two other departments.  (R. 15.)  The podiatry department was the busiest department providing surgical services at VA Togus, treating more than 5,000 patients annually.  (R. 55.)  Simultaneously with his work at VA Togus, Franchini worked at Maine Medical Center and Mercy Hospital in Portland, Maine.  (R. 9.)

As detailed in the VA New England Healthcare System's Performance Plans for the Chief of Podiatry for the fiscal years 2006 and 2007 (R. 157–72), as Chief of Podiatry, Dr. Franchini

was subject to evaluation on a number of "Performance Measures and Key Core Competencies," including:[13]

- "[o]perat[ing] an effective program to receive, evaluate and resolve patient initiated complaints" (R. 160);

- "track[ing] data to identify and correct systemic issues" (id.);

- improving "veteran and family satisfaction with VA care by promoting patient centered care and excellent customer service" (R. 166);

- "[a]llocat[ing] resources, including funds, staff, equipment and plant, in an effective manner responding to changes in budget plan, construction issues, VHA and Network priorities, etc." (R. 159, 170);

- "balanc[ing] various stakeholder needs including those of patients, staff, affiliates, Labor Partnership, and Veteran Service Organizations to optimize outcomes" (id.); and

- "[m]aintain[ing] effective relations with the public and media, which results in a positive image of VA in the network or the community." (R. 158, 170.)

Beyond these performance plan documents, Franchini recalls receiving "oral orders" or "instructions" from Dr. Robert Sampson, VA Togus's Chief of Surgery, when he started as the Chief of Podiatry. (R. 13, 21, 45.) According to Franchini, Sampson described the responsibilities of this position as: "see patients, see patients with respect, treat them with kindness, see a lot of patients, make everybody happy, play nice in the sandbox." (R. 20.) Franchini understood these instructions to mean "when you're with two other podiatrists and you're the third and you're lower

---

[13] Franchini has testified that these performance plans were "just generation of government workers writing bullet points that were not part of the program" at VA Togus. R. 21. A second former VA Togus podiatrist's testimony echoed these sentiments. See Mason Dec., PageID # 3269. Nevertheless, Franchini has also acknowledged certain handwritten marginalia in the 2007 plan and expressed a belief that they were added by Sampson. R. 48. Additionally, these documents provided a performance review framework that informed the performance evaluations completed by Dr. Robert Sampson, VA Togus's Chief of Surgery, and signed by Franchini for fiscal years 2006 and 2007. See R. 265–88. Franchini maintains that he was only shown the initial pages of those appraisals and not the performance plans. R. 56–57.

ranked than they are to, just - everybody plays nice, make peace, don't cause any problems, get the job done."[14]   (Id.)

For the fiscal year 2006, Franchini prepared for Sampson a set of eight "performance bullets" (R. 13), including the following accomplishments:

- "[r]educed Backlog and Clinical access in Podiatry to the point where we can see a consult same day";

- "[c]ertified as a Home Tele health physician and starting a pilot program in regards to this in the Podiatry Department";

- "[m]ember of the new Self Assessment Team which will study ways to improve the way we can provide care to our Veterans";

- "[a]ssisted in education and training of the PA students who rotated at Togus";

- "[c]ontinue to run one of the most busy department at the facility where we have seen for the past two fiscal years over 5000 pts annually"; and

- "[m]ember of the [Patient Alliance Care Team]."

(R. 55, 122.)[15]   In 2007, these performance bullets were incorporated into documentation of a three-step, "special advancement for performance" increase for Franchini, to GS-15, Step 7, which translated to a roughly $10,000 pay increase.  (R. 123–27.)

---

[14] Defendants object to the admission of Sampson's statement on hearsay grounds.  Defs. Reply SMF (ECF No. 148), PageID # 3334.  Insofar as Franchini offers the statement for the truth of the matter asserted, the Court agrees.  See, e.g., United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008) ("The hearsay rule applies to out-of-court statements 'offered in evidence to prove the truth of the matter asserted.'") (quoting F.R.E. 801(c)).  However, to extent its significance "lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  Id. (quoting F.R.E. 801(c) advisory committee's note).  The Court admits the statement for this specific use.

In any event, Franchini and two other former VA Togus podiatrists have additionally asserted that the title of Chief of Podiatry was "essentially nominal and ceremonial," and that the holder lacked any true authority beyond that of any other podiatrist in the department.  Franchini Dec., PageID # 3226; see also Scheuller Dec. (ECF No. 143), PageID # 3260; Mason Dec. (ECF No. 144), PageID #s 3266–67.  These statements lack the same hearsay concerns, but their credibility ultimately would be the preserve of the factfinder.

[15] Franchini has testified that the reduction in the backlog was achieved solely by virtue of his addition to the department as a third podiatrist, rather than by any action he took as Chief.  R. 13.  He has also testified that he "was not running anything," all real authority lay with Sampson, and his role in the various programs and teams was confined to acting as Sampson's "eyes and ears."  R. 14–15.

In 2008 or 2009, Franchini was removed from the Chief of Podiatry position and became a Staff Podiatrist.[16] (R. 22.) In early 2010, a review of Franchini's performance was initiated. (R. 64–65.) On March 29, 2010, Franchini was asked by Sampson to "voluntarily suspend performance of surgery." (Id.) In April 2010, Franchini was summarily suspended. (Id.)

In a June 17, 2010 letter, Dr. Timothy Richardson, VA Togus's Chief of Staff, informed Franchini that a review undertaken by three VA doctors had led to a Professional Standards Board recommendation that his clinical privileges be revoked and that he be removed from federal service. (R. 204.) On October 29, 2010, Franchini, through his attorneys, submitted a reply incorporating the review of two further doctors and arguing against the revocation of his privileges. (R. 216–24.)

On November 8, 2010, Franchini resigned from his employment at VA Togus. (Stip. Facts, PageID # 3182; see also R. 173–75.) In his resignation later, he attributed his resignation to "an anecdotal concern which was unfounded." (R. 156.) A letter dated November 19, 2010, from VA Togus Director Brian G. Stiller, informed Franchini that his resignation letter had been received and provided notice that VA Togus was "making a review of the concerns raised regarding [his] clinical practice," the results of which would inform whether it would report "to the appropriate State Licensing Boards." (R. 201–03.) After leaving VA Togus, Franchini entered private practice. (R. 9.)

**C. Post-Departure Review & Litigation**

In November 2012, VA Togus sent letters to the state licensing boards of Maine, New York, Rhode Island, Vermont, and Washington, D.C., informing them of "significant evidence

---

[16] Franchini testified that the change was due to his lack of enthusiasm for attending meetings in Sampson's stead. R. 22; see also R. 387.

that [Franchini] so significantly failed to meet generally-accepted standards of clinical practice so as to raise reasonable concerns for the safety of patients." (R. 176–80.)

Between January and March 2013, in correspondence between VA officials and the chairman of the U.S. House of Representatives' Committee on Veterans' Affairs, it was noted that the record review of a VA Togus podiatrist's clinical care resulted in the identification of 286 total patients who required additional clinical evaluation. (See R. 128–29; 357–59.) In 2013, the VA sent a "second wave" of letters to Franchini's former surgical patients to disclose potential claims that might have arisen as a result of Franchini's treatment. (R. 69.)

In the ensuing years, seven former patients pursued Federal Tort Claims Act claims against the United States in the District of Maine, claiming damages as a result of treatment each received from Franchini at VA Togus (collectively, the "FTCA Cases"). (Stip. Facts, PageID #s 3182–83; see Carpenter v. United States, No. 1:18-cv-00128-JDL; Downs v. United States, No. 1:15-cv-00525-JDL; Korsiak v. United States, No. 1:15-cv-00220-JDL; Mansir v. United States, No. 1:14-cv-00503-JDL; Myrick v. United States, No. 1:15-cv-00045-JDL; Prescott v. United States, No. 1:14-cv-00551-JDL; Wood v. United States, No. 1:14-cv-00399-JDL.)[17] As these cases progressed, multiple public filings were made that referenced Franchini and his work at VA Togus,[18] including:

---

[17] Of the FTCA Cases, Carpenter and Korsiak were dismissed for lack of jurisdiction, while the remaining cases settled. The Court notes that Franchini was initially named a defendant in Carpenter before the Government was substituted for him individually.

[18] Franchini allows that these filings were made but contends that they were not publicly accessible because a member of the public would have to use the Court's Public Access to Court Electronic Records ("PACER") system to access them. Pl. Am. Resp. SMF (ECF No. 159), PageID # 3416. This argument is without merit. PACER is "an electronic public access service that allows users to obtain case and docket information online." Eil v. United States DEA, 878 F.3d 392, 396 (1st Cir. 2017) (quoting Public Access to Court Electronic Records, United States Courts, https://www.pacer.gov/). Information available through PACER is "publicly available." Id. at 399.

- an exhibit titled, "Institutional Disclosure of Adverse Event," in which the VA documented its 2013 disclosure of substandard care provided by Franchini to a veteran;[19]

- March 10, 2017 deposition testimony by the former VA Togus medical director, Ryan Lilly, acknowledging that "Dr. Franchini's care" of six FTCA plaintiffs "fell below the acceptable standards";[20]

- an exhibit titled, "VA Issue Brief," which, though only referring to Franchini as "Staff Podiatrist," chronicled his resignation from Togus following the VA's notice of "proposed removal and revocation of clinical privileges";[21]

- January 20, 2017 deposition testimony of Sampson, describing Franchini as a "dangerous surgeon";[22] and

- a declaration from Yuri Walker, the VA's Director of Risk Management, clarifying that her April 30, 2012 Memorandum for the Record's conclusion that "Dr. Franchini was 'actively falsifying some medical records' . . . was based entirely upon the review team's review of patient medical records, and nothing else."[23]

In February 2016, Judge Levy issued an order in the then-pending FTCA cases that referenced Franchini by name numerous times.  See generally Wood v. United States, No. 1:14-cv-00399-JDL, 2016 U.S. Dist. LEXIS 13689 (D. Me. Feb. 2, 2016).  However, the Order was limited to addressing a pending motion to dismiss for lack of subject matter jurisdiction and explicitly noted that the court was not reaching any "conclusions as to whether Dr. Franchini's treatment of the plaintiffs was negligent, as the plaintiffs claim."  Id. at *4.  Franchini became aware of the FTCA Cases when he was presented with this February 2016 Order by his then-

---

[19] R. 1307–17.  This exhibit was first docketed on April 6, 2015.  See Wood, No. 1:14-cv-00399-JDL (ECF No. 19-1).

[20] R. 2145.  This deposition was first docketed on August 30, 2017.  See Wood, No. 1:14-cv-00399-JDL (ECF No. 112-8).

[21] R. 1411–12.  This exhibit was first docketed on August 30, 2017.  See Wood, No. 1:14-cv-00399-JDL (ECF No. 112-4).

[22] R. 1554.  This deposition was first docketed on August 30, 2017.  See Wood, No. 1:14-cv-00399-JDL (ECF No. 112-5).

[23] R. 2193.  This declaration was first docketed on September 27, 2017.  See Wood, No. 1:14-cv-00399-JDL (ECF No. 115-2).

employer, who had discovered the order via an internet search. (R. 32, 78.) Franchini was subsequently terminated due to concerns of bad publicity. (R. 32.)

In May 2016, Franchini, acting pro se, sent the court a "Request" to "remove the link of [his] name to [an] online document,"—namely, the February 2016 Order—noting that "a google search based on [his] name" yielded the Order. (R. 151; Wood, No. 1:14-cv-00399-JDL (ECF No. 55).) Judge Levy denied this request, observing that the February 2016 Order had been public for months, Franchini's name appeared numerous times in the public record of the proceedings, and his name was "also associated with [the] proceeding in documents that [were] available on the internet and easily identified through the use of a search engine." (R. 1379; Wood, No. 1:14-cv-00399-JDL (ECF No. 58).)

In September 2017, Franchini submitted a sworn declaration in the FTCA litigation, in which he denied that he had ever lied or otherwise concealed information on any patient's condition and disagreed that he had ever provided substandard care to any patient. (R. 137; Wood, No. 1:14-cv-00399-JDL (ECF No. 115-1).)[24]

### D.     Franchini's Blog

Beginning in 2016, Franchini maintained a blog titled, "Foot and Ankle Forum." (Stip. Facts, PageID # 3182; R. 32–33, 152–54.) On June 27, 2016, following the denial of his request to strike his name from the February 2016 Order, Franchini made the following initial post, reproduced here in whole:

> This is an overview on events in my life and what it has on what occurred
> In the VA system. I Dr Thomas C Franchini worked at the VA in Maine
> For 6 years and 7 months during that time I was awarded
> Multiple salary raises plus received dozens of accolades from patients as well as
> coworkers

---

[24] Franchini has testified that this affidavit was both requested and prepared by the Assistant United States Attorney defending the Government in the FTCA Cases. R. 36.

I treated the veterans as my own based on the fact that I too was a veteran and services
10.5 years on active duty as well as 6 years as a reserve officer in the United States Navy
After 6 years of positive work with no complaints from anyone
Doing surgery with not one but with 8 different surgeons
And one fellowship trained orthopedic surgeon who performed
67 hours hours together of surgical time
After all that one patient complained which lead to a review
Now the true fact that my notes were brief but not my care
This review focused in on my notes
They never allowed my to explain and they came to a decision
I after over a year rebutted all issue and then based on that fact that they could not
Find something that was wrong other then brief note taking
They thought it would be a good idea to contact over hundred people
That I did surgery on and ask them if there was a problem
Well this brought the second wave because the people who came forward
We're silent for years and after they thought that this could be
Beneficially in some why now they had issues
Some were 8 years after the case
Anyway I wanted to be explained
How can anyone resurrect issues after a prolonged period of
Time
This leads to statue of limitation or a statute of repose
Well it was determined that it was a statue of resposr
And that these old complaints were unable to proceed
Let's face it we had people change
We get older heavier weaker stronger sicker healthier
That is why there is a limitation
Because life gets in the way of events of this nature
What is good today cannot be a guarantee that thoughtout your life things change
New injury
Weigh gain
Age of our bodies these are all variables that need to be addressed
Your thoughts

(R. 154.)  According to Franchini, the purpose of his blog "was to deny allegations of the [February

2016 Order]"; that is, "to counteract, make the record straight, defend [him]self," while he searched

for new employment.  (R. 72.)  He proceeded to make a total of eleven posts in the blog.  (R. 152.)

According to Franchini, he attempted to shut the blog down after making a last entry in October

2016 (R. 34, 72), but he realized it was still accessible in October 2017 "after the libel publications"

and then successfully took it down at that point (R. 72).  The blog received a comment on October

12, 2017, from an individual who professed to have been a former colleague of Franchini and found him to be "a great surgeon." [25]  (R. 154.)

### E.    Publications Referencing Franchini's Tenure at the VA

In April 2014, *The Forecaster* (a Maine publication) published, in print and online, an article by David Harry titled, "South Portland Veteran Fights VA to File Damage Claim," which recounted the allegedly substandard care Franchini provided to Myrick.  (R. 130–35.)  In addition to describing his own alleged mistreatment and the VA's rejection of his damages claim, the article cited Myrick as stating he feared "80 or more other patients treated by Franchini [were] also suffering because of the care they received."  (R. 130.)  The article also described responses to inquiries made to VA officials and Senator Collins's office and discussed case law that could potentially leave Myrick's FTCA claim time-barred.  (R. 130–31.)  Franchini contacted Harry to ask him to remove the article "because it was filled with lies." (R. 30.)  Harry refused.[26]  (Id.)

More than three years later, on October 1, 2017, Defendant MTM Acquisition, Inc., published in the *Portland Press Herald* an article written by Defendant Edward Murphy titled, "Maine Veterans Given Substandard Care Are Told It's Too Late to Sue."  (R. 245–55.)  The article described developments in the FTCA Cases and the alleged substandard care received by several of the FTCA plaintiffs from Franchini, highlighting in particular allegations made by April Wood.  (R. 245–46.)  The article referenced Walker's testimony concerning Franchini's alleged

---

[25] Franchini has insisted that there were no "hits" on his blog other than the October 2017 commenter.  See Franchini Dec. (ECF No. 142), PageID # 3234.  The Court notes, however,  that (1) there is indication on the face of the blog entries produced that the blog (or, potentially, Franchini himself) had five followers at the time it was downloaded, see R. 152; (2) there is indication that the entries produced were accessed by a user other than Franchini's colleague (apparently as late as February 2018), if only to be produced for this litigation, id.; and (3) the blog is directly quoted in one of the allegedly defamatory articles (strongly suggesting it was accessed), R. 247.

[26] Neither *The Forecaster* nor Harry are defendants in this action.  The Court notes that Harry's article appears to have been carried by a second publication, the *Sun Journal*, as well.  See David Harry, South Portland Veteran Fights VA to File Damage Claim, Sun Journal (Lewiston, Me.), May 2, 2014.

falsification of records, and it further cited a VA spokesman as having stated that Franchini "resigned from the VA after the agency told him to step down or he would be fired in early 2010." (R. 247.)  The article stated that Franchini declined to comment for the article,[27] and it instead quoted excerpts from his blog entry reproduced above.[28]  (Id.)  The article also made attempts to center Franchini's alleged substandard care within broader controversies surrounding the VA generally and VA Togus in particular.  (R. 247–48.)

On October 11, 2017, Defendant Gannett Company, Inc., published in *USA Today* an article co-written by Defendant Donovan Slack titled, "VA Conceals Shoddy Care and Health Workers' Mistakes."  (R. 256–64.)  The article described the VA's response to concerns it identified during investigations of its medical providers, including podiatrists, and reported specifically about the investigation of Franchini and the allegations made against him.  The article stated that Franchini had "made mistakes that harmed veterans" in "88 cases," yet he had been allowed to "quietly resign and move on to private practice."  (R. 256.)  Prior to publication, Franchini met with Slack and urged her to instead print what he viewed as the "real story."  (R. 36.)[29]

On October 26, 2017, Defendant Bangor Publishing Company, Inc., published in the *Bangor Daily News* an article written by Defendant Meg Haskell titled, "I Never Had Anything Hurt So Bad':  Veteran Harmed at Togus Hopes Revelations Protect Younger Vets."  (R. 302–06.)

---

[27] Franchini testified that, although Murphy called Franchini's office, he did not take Murphy's call because Murphy did not identify himself as a reporter.  R. 68.

[28] The Court notes that the complimentary comment left on Franchini's blog post was dated October 12, 2017, after both this article and the next discussed article had been published.  R. 154.

[29] Franchini has testified that he was coerced into attending this meeting by the threat of "more damning" reporting. R. 36.  The Court notes that the basis for Count V in Franchini's Amended Complaint is that he was induced to attend this meeting via a false promise that the location of his then-employer would not be revealed in the article.  See Am. Compl., PageID #s 57–58.

The article, drawing upon the *USA Today* report, detailed further allegations made by Jim Barrows, whom it reported as being "among a group of 88 vets who suffered under the care of Thomas Franchini, a podiatrist at Togus health center from 2004 until his forced resignation in 2010."  (R. 302.)  The article stated that Franchini had "botched" an ankle surgery he performed on Barrows in 2006, realizing weeks later that "he had neglected to remove a temporary suture, leaving the operative site open to infection, inflammation and other complications."  (R. 303.)

On December 22, 2017, Defendant Investor's Business Daily, Inc. ("IBD") published an article titled, "VA Negligence is Killing Veterans."[30]  (R. 307–09.)

## IV.   DISCUSSION

In his Amended Complaint, the published statements Plaintiff alleges to be defamatory fall into two main categories: (1) statements made concerning the quality of care he provided to patients at VA Togus; and (2) statements concerning the circumstances of his departure from VA Togus.  (See Am. Compl., PageID #s 53–56.)

Due to the inherent free speech implications of defamation actions, the U.S. Constitution imposes various requirements independent of those established by state law.  Veilleux v. National Broadcast. Co., 206 F.3d 92, 108 (1st Cir. 2000).  One such requirement denies to plaintiffs deemed to be either public figures or public officials any recovery in the absence of proof of actual malice. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).  This requirement arises from "the background of [our] profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  New York Times Co. v. Sullivan, 376 U.S. 254,

---

[30] This article was written by Sally Pipes, who was previously named as a Defendant in this matter.  Franchini's claims against Pipes were dismissed without prejudice, leaving IBD as the sole Defendant as to this particular publication. See 9/5/19 Order (ECF No. 83).  To the extent that IBD has joined the pending Motion for Summary Judgment, the Court concludes that the ongoing stay and interlocutory appeal prevent the Court from ruling on the merits of IBD's request for summary judgment.  See supra n.1.  Thus, the Motion shall be denied without prejudice to later renewal as to Defendant IBD only.

270 (1964). Because the Court previously held that Plaintiff has not alleged facts permitting an inference of actual malice, the determination of Plaintiff's status has become dispositive as to his defamation claims. See Franchini, 383 F. Supp. 3d at 59–60.

Defendants bear the burden of establishing Plaintiff's status as a public figure or public official. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 588 (1st Cir. 1980). While ascertaining a defamation plaintiff's status "may in some cases require a detailed fact-sensitive determination, the matter is resolved as a question of law, and when possible, it is perfectly reasonable to . . . decide . . . during pretrial proceedings." McKee v. Cosby, 874 F.3d 54, 61–62 (1st Cir. 2017) (cleaned up); see also Pendleton v. City of Haverhill, 156 F.3d 57, 68 (1st Cir. 1998) ("[T]he question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts."). However, summary judgment may not be predicated on a "vacillatory" record; that is, one that "tend[s] to support conflicting inferences" material to the status determination calculus. Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 206–07 (1st Cir. 2006).

Against this backdrop, the Court considers whether the current record establishes that Plaintiff was a public figure or public official.

### A. Public Figure

As to public figure status, Gertz "delineated three major classes of public figures." Bruno, 633 F.2d at 588. First, an individual can become a "general-purpose" public figure if he "achieves such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." McKee, 874 F.3d at 61 (cleaned up). Second, an individual can become a voluntary, limited-purpose public figure ("voluntary public figure") if he "voluntarily injects himself . . . into a particular public controversy and thereby becomes a public figure for a limited range of issues," the scope of which is determined by the "nature and extent of [his] participation in the particular

controversy giving rise to the defamation." Id.  Third, a person may become an involuntary, limited-purpose public figure ("involuntary public figure") "through no purposeful action of his own." Gertz, 418 U.S. at 345.

Here, Defendants argue that Plaintiff is a limited-purpose public figure, qualifying both as a voluntary public figure and as an involuntary public figure.  Thus, the Court first considers whether the record establishes a public controversy, and then turns to whether the record establishes that Plaintiff can be viewed either as having voluntarily injected himself into that controversy or as having involuntarily become a central figure in that controversy.

### 1. Public Controversy

Any limited public figure analysis begins by defining a public controversy, which must antedate the publication of the alleged defamatory statements.[31]  To establish the requisite public controversy, it must be shown that "persons actually were discussing some specific question" prior to the alleged defamation, and that "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 13 (1st Cir. 2011) (quoting Bruno, 633 F.2d at 591).  Thus, a public controversy "must be more than a cause célèbre, or a matter that attracts public attention." Id. at 13 (cleaned up).

Plaintiff seeks to frame any public controversy here as limited to the FTCA Cases and then invokes Time, Inc. v. Firestone, 424 U.S. 448 (1976).  (See Pl. Response (ECF No. 141), PageID #s 3203–05.)  In Firestone, the Supreme Court held that a private, high-society divorce

---

[31] The requirement that the controversy antedate the alleged defamation is essential "to avoid improper 'bootstrapping.'" Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 14 (1st Cir. 2011).  "Bootstrapping . . . occurs when the defendant relies on his own defamatory publication to manufacture a public controversy involving the plaintiff, and thus by his own conduct, creates his own defense by making the claimant a public figure." Id. at 18 (cleaned up).  If permitted, it would effectively render the public controversy requirement a formality.

proceeding was not a "public controversy" despite being a "cause célèbre" in the media.  424 U.S.

at 454.  The Supreme Court observed that,

> while participants in some litigation may be legitimate "public figures," either
> generally or for the limited purpose of that litigation, the majority will more likely
> resemble respondent, drawn into a public forum largely against their will in order
> to attempt to obtain the only redress available to them or to defend themselves
> against actions brought by the State or by others.

Id. at 457.

Simply put, Plaintiff's attempt to analogize the FTCA Cases to the divorce case at issue in

Firestone is unpersuasive.  See Bruno, 633 F.2d at 590 ("The *ipse dixit* in Firestone that marital

difficulties even of the wealthy were not matters of public controversy is understandable as an

instinctive reaction that the public can have no interest other than satisfaction of its curiosity in the

outcome of a divorce proceeding.")  As the First Circuit has acknowledged, "[t]he mere fact that

the immediate proceeding is between private individuals . . . does not guarantee that there could

be no public controversy."  Id.  In any event, the FTCA cases were not simple medical malpractice

cases involving private individuals on both sides.  Rather, the ultimate defendant in each of these

matters was the United States, which in itself invites public attention and concern.  Moreover, in

the Court's view, the FTCA cases were part of a larger public controversy focused on the quality

of care provided by the VA to veterans at Togus.

In short, focusing on the time period preceding October 1, 2017, when the first article in

question was published, the Court readily concludes that there was a public controversy

surrounding the care provided to veterans at VA Togus.  As detailed in the Court's factual

discussion, this controversy existed prior to Plaintiff's tenure at VA Togus and extended long after

his departure.  See, e.g., Gray v. St. Martin's Press, Inc., 221 F.3d 243, 251 (1st Cir. 2000) (defining

a public controversy as covering "the methods and influence of lobbyists in Washington" and

stretching "from the early 1980s onward"). Thus, the Court proceeds to consider Franchini's role in that controversy.

### 2. Voluntary Public Figure

Once a legitimate public controversy is identified, the initial question for determining voluntary public figure status is whether the plaintiff "thrust himself into the vortex" of this controversy "in order to influence the resolution of the issues involved." Gertz, 418 U.S. at 345, 352; see also McKee, 874 F.3d at 62. Courts have recognized multiple ways an individual can inject himself into a public controversy, including: (1) making statements bearing on the controversy, see, e.g., Pendleton, 156 F.3d at 69–70; (2) encouraging third parties to make public statements regarding the controversy, Berisha v. Lawson, 973 F.3d 1304, 1311 (11th Cir. 2020); see also Bruno, 633 F.2d at 591–92 (suggesting that a "concentrated advertising blitz" would constitute a "thrusting into the vortex"); or (3) choosing to assume a position or enter a profession that draws one into public view and invites public discussion in relation to the issue, see Gray., 221 F.3d at 251; Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F. Supp. 2d 158, 172 (D. Me. 2007), aff'd on other grounds, 528 F.3d 94 (2008).[32] What these various methods share in common is intentional participation in the controversy in question.

Defendants contend that Plaintiff "injected himself into . . . various controversies relating to the care he provided" by (1) assuming his position at VA Togus; (2) contacting the author of *The Forecaster* article; (3) posting on his blog; (4) making filings in the FTCA Cases; and (5)

---

[32] The First Circuit has not expressly required that individuals have regular media access as a prerequisite to finding a voluntary limited public figure. Contra La Liberte v. Reid, 966 F.3d 79, 91 (2d Cir. 2020) (requiring "regular and continuing access to the media" as an element of a four-part test for limited purpose public figures). While such access was discussed as part of the rationale for the voluntary public figure category in Gertz, sweeping changes to both the media landscape, including the increasing use of social media platforms, has given all individuals with internet access "greater access to . . . channels of effective communication." Gertz, 418 U.S. at 344; see also, e.g., Berisha v. Lawson, 141 S. Ct. 2424, 2429 (July 2, 2021) (Gorsuch, J., dissenting from cert. denial) ("In many ways, it seems we have arrived in a world that dissenters proposed but majorities rejected in the Sullivan line of cases—one in which, voluntarily or not, we are all public figures to some degree." (cleaned up)).

meeting with Defendant Slack.   (Defs. Mot. (ECF No. 138), PageID #s 3152–53, 3161–66.) Plaintiff counters that he did not inject himself into a public controversy; any public controversy that arose was at most a result of the allegedly defamatory statements; and his own public statements were protected by the privilege of reply.  (Pl. Response, PageID #s 3202–19.)

Focusing on 2004, there is no dispute that Franchini voluntarily accepted the position of Chief of the Department of Podiatry, the busiest department providing surgical services at VA Togus, a facility already at the center of a public controversy.  The nature of the position invited public concern and comment regarding his qualifications and performance, as well as the circumstances surrounding his eventual departure.  See Pendleton, 156 F.3d at 69 ("[I]t is at least arguable that if a person holds . . . any public post which entails control over matters of substantial public concern, then his qualifications for serving in that capacity are likely to engender the type of public debate and discussion that the First Amendment protects.").  In short, by accepting a leadership position at VA Togus, Plaintiff voluntarily took on a public service role and, given the public discussion surrounding the availability of quality care at VA Togus prior to his arrival, it was foreseeable that publicity might arise.  See Gertz, 418 U.S. at 344 (noting that governmental service involved "the risk of closer public scrutiny"); Lluberes, 663 F.3d at 15 n.8 ("The relevant question is . . . whether they volunteered for an activity out of which publicity would foreseeably arise.") (cleaned up).

The Court finds support for this conclusion in Lohrenz v. Donnelly, 350 F.3d 1272 (D.C. Cir. 2003).  In Lohrenz, a public controversy existed about the appropriateness of women serving in combat roles in the United States military.  Lohrenz, 350 F.3d at 1275.  After completing the appropriate training, the plaintiff became one of the first female combat pilots.  Id. at 1274–75. The D.C. Circuit held that she had voluntarily injected herself into the controversy by choosing

combat aircraft, assuming the risk of a combat assignment, and then becoming one of two American women combat pilots.  Id. at 1282.  Similarly, in Fiacco v. Sigma Alpha Epsilon Fraternity, this Court held that a public controversy existed regarding the disciplinary process at the University of Maine and that the plaintiff injected himself into that controversy when he voluntarily accepted the position of Director of Judicial Affairs. 484 F. Supp. 2d 158, 171–72 (D. Me. 2007), aff'd on other grounds, 528 F.3d 94 (2008).[33]  Likewise, in Norris v. Bangor Publ'g. Co., where a political consultant claimed defamation, the presiding judge found that by "voluntarily accept[ing] a job researching a candidate for national office on behalf of a national political organization," the plaintiff became "a public figure for the limited purpose of his role in the 1996 Maine Senate race."  53 F. Supp. 2d 495, 503–04 (D. Me. 1999).

Beyond Franchini's decision to accept his leadership role at VA Togus,[34] the Court finds that the other voluntary actions Plaintiff took related to the controversy surrounding the care he had provided at VA Togus bolster a finding that he voluntarily achieved limited public figure status.  Those actions include: (1) his 2014 contact with the author of The Forecaster article; (2) his 2016 blogging; (3) his 2016 individual pro se filings in the FTCA Cases; and (4) his meeting with Defendant Slack.  Notably, all of these actions share a closer "temporal link" with the public

---

[33] Though Defendants cited Fiacco extensively, see Defs. Mot., PageID #s 3166–71, Plaintiff did not seek to distinguish the opinion or otherwise demonstrate that its reasoning is no longer sound.  Absent such a showing, the Court is obliged to follow Fiacco under the doctrine of stare decisis.  See Gately v. Massachusetts, 2 F.3d 1221, 1226 (1st Cir. 1993) ("The doctrine of stare decisis renders the ruling of law in a case binding in future cases before the same court . . . ."); see also June Med. Servs. L.L.C. v. Russo, 140 S. Ct. 2103, 2134 (2020) (Roberts, C.J., concurring) ("The legal doctrine of stare decisis requires us, absent special circumstances, to treat like cases alike.").

[34] The Court necessarily acknowledges that there is a temporal gap between Franchini's 2004 decision to take the Chief of Podiatry position at VA Togus and the 2017 publications at issue here.  This "temporal dimension" might arguably make this case factually distinguishable from other cases, including Fiacco.  Pendleton, 156 F.3d at 70 (1st Cir. 1998) (finding a "temporal link" of "less than a year" adequate).  Thus, the Court proceeds to consider the voluntary actions that Franchini took in the years immediately preceding the news articles at issue.  See Lluberes, 663 F.3d at 15 n.7 (noting that the plaintiffs' "leadership positions and how they leveraged those positions" when "combined with other factors" supported a finding that plaintiffs were public figures.)

controversy that prompted the 2017 publications at issue in this case.  Pendleton, 156 F.3d at 70

(noting "there may be a temporal dimension to any 'limited-purpose public figure' analysis").

However, Plaintiff argues that some or all of these voluntary actions fall under the privilege

of reply.  (See Pl. Response, PageID # 3213.)  This privilege has its origins "not in the First

Amendment but in the common law that governed defamation suits prior to New York Times."

Lluberes, 663 F.3d at 18.  "Writ large, [the common-law privilege of reply] allowed a defamed

person to respond [to accusations] to the extent reasonably necessary to defend himself, even to

the point of defaming his accuser."  Id.  The First Circuit has endorsed the privilege in a "limited

sense," holding that "an individual should not risk being branded with an unfavorable status

determination merely because he defends himself publicly against accusations, especially those of

a heinous character."  Id. at 19 (citing Clyburn v. News World Commc'ns, Inc., 903 F.2d 29, 32

(D.C. Cir. 1990) ("[W]e have doubts about placing much weight on purely defensive, truthful

statements made when an individual finds himself at the center of a public controversy but before

any libel occurs; it is not clear why someone dragged into a controversy should be able to speak

publicly only at the expense of foregoing a private person's protection from defamation.")); see

also Pendleton, 156 F.3d at 68 ("[O]ne does not become a public figure merely by defending

oneself publicly against accusations.")  It is far from apparent that this limited endorsement of the

privilege of reply applies to the fact pattern presented on the current record or forecloses the Court

from any consideration of Franchini's voluntary actions in the 2014-to-2016 timeframe.[35]  In any

event, to the extent that the privilege of reply would foreclose the Court's finding that Franchini

---

[35] Assuming for the moment that Franchini's actions in this time period immediately preceding the publications could be covered by the privilege of reply, the Court acknowledges that Franchini's actions would only be subject to the privilege to the extent the actions were reasonable and truthful.  See Lluberes, 663 F.3d at 20  (concluding that conduct that "went well beyond any reasonable measure of self-defense" could not be protected by the privilege of reply); see also Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1559 (4th Cir. 1994) (listing actions that can cause the loss of the conditional privilege of reply).

became a voluntary public figure, the Court proceeds to consider whether Franchini may have alternatively achieved limited public figure status involuntarily.

### 3. Involuntary Public Figure

In <u>Gertz</u>, the Supreme Court stated that an individual can "become a public figure through no purposeful action of his own," but also qualified that "the instances of truly involuntary public figures must be exceedingly rare." 418 U.S. at 345; <u>see also</u> <u>Alharbi v. Beck</u>, 62 F. Supp. 3d 202, 211 (D. Mass. 2014) ("[T]he involuntary public figure is a rare bird, but not an extinct one.") In the intervening years, the First Circuit has more than once acknowledged that <u>Gertz</u> envisioned this category of public figure, although the Circuit has not explicitly confronted the issue. <u>See</u> <u>Lluberes</u>, 663 F.3d at 13 n.4; <u>Pendleton</u>, 156 F.3d at 67 n.7; <u>Penobscot Indian Nation v. Key Bank of Me.</u>, 112 F.3d 538, 561 (1st Cir. 1997); <u>Bruno</u>, 633 F.2d at 588.

However, the D.C. Circuit confronted the issue of involuntary public figures in <u>Dameron v. Washington Mag., Inc.</u>, 779 F.2d 736 (D.C. Cir. 1985). In <u>Dameron</u>, the plaintiff was an air traffic controller who had been on duty during the 1974 Mt. Weather plane crash that resulted in 92 deaths. <u>Id.</u> at 737–38. The defendant, a magazine publisher, published an article that focused on a different 1982 plane crash but contained a sidebar focusing on aviation safety at National Airport that suggested Dameron had been assigned partial blame for the 1974 crash. <u>Id.</u> at 738. The D.C. Circuit held that the plaintiff was an involuntary limited-purpose public figure in the controversy over "air safety in general and the Mt. Weather crash in particular." <u>Id.</u> at 741. The Circuit reasoned that the plaintiff "became embroiled, through no desire of his own, in the ensuing controversy over the causes of the accident. He thereby became well known to the public in this one very limited connection." <u>Id.</u> at 742. Despite the passage of time between the initial controversy and the allegedly defamatory publication, the "same very limited connection" led to a "brief and oblique reference to him . . . years later." <u>Id.</u> In short, the plaintiff's position as a central

figure in a public controversy preexisting the publication of the allegedly defamatory statements suffice to make him an involuntary public figure.

Notably, in <u>Gray</u>, the First Circuit utilized a "central figure" analysis in affirming the conclusion that a plaintiff lobbyist was a limited public figure in connection with the 1992 publication of *The Power House:  Robert Keith Gray and the Selling of Access and Influence in Washington*.  221 F.3d at 247, 251 (describing Gray as "being identified as one of the best-known of the high-level Washington public relations experts, an emblematic figure, and a self-professed defender against attacks on lobbying.").[36]  As detailed in the First Circuit's opinion, Gray's lobbying career had begun in 1961 and stretched through the mid-1980s.  <u>See</u> <u>id.</u> at 247.

Similar to Dameron and Gray, Franchini's professional work led to his involvement in a public controversy, albeit one that he did not affirmatively seek out.  When this controversy is narrowly framed as focusing on the care provided at VA Togus during his six-year term of service, Plaintiff is easily viewed as a central figure in that controversy.  Concerns regarding his standard of care and the circumstances of his exit were broadcast by the VA to his former patients, Congress, and state licensing boards.  These concerns then received local news coverage in 2014.  Then, these same concerns became central to the publicly filed FTCA Cases, which, in turn, fueled further public interest and the 2017 publications that Plaintiff now claims defamed him.  As was the case for Dameron and Gray, it is possible for ongoing public controversies to bring belated scrutiny to a central figure in that controversy.  In short, to the extent Plaintiff cannot be viewed as a voluntary public figure, the Court alternatively concludes Plaintiff attained public figure status involuntarily in the time period preceding the Defendants' publications.

---

[36] In affirming the finding that Gray was a limited public figure, the First Circuit did not explicitly designate him as a "voluntary" or "involuntary" limited public figure.

26

### B. Public Official

Defendants also argue that Plaintiff qualifies as a public official.  (See Def. Mot, PageID #s 3168–71; Defs. Reply (ECF No. 147), PageID #s 3312–14.)  In determining public official status, the Court must take into account: "(i) the extent to which the inherent attributes of a position define it as one of influence over issues of public importance; (ii) the position's special access to the media as a means of self-help; and (iii) the risk of diminished privacy assumed upon taking the position."  Mandel, 456 F.3d at 204.

At the outset, this analysis would be complicated on the record presented because Franchini held two different positions at VA Togus.  One of those positions, Staff Podiatrist, would clearly appear not to qualify as a public official under existing First Circuit precedent.  See Kassel v. Gannett Co, Inc., 875 F.2d 935, 941 (1st Cir. 1989).  Specifically, in holding a VA Staff Psychologist did not qualify as a public official in Kassel, the First Circuit explained, "To call non-supervisory staff doctors at a VA hospital 'public officials' would undervalue privacy rights by distort[ing] the plain meaning of the 'public official' category beyond all recognition." Id. (cleaned up).

Arguably, Plaintiff's initial tenure as Chief of Podiatry might be viewed as a "supervisory staff doctor" seemingly outside the holding of Kassel.  However, the Court acknowledges that Defendant has argued and proffered evidence that this was a "ceremonial title."  (Pl. Response, PageID # 3198.) Because there appear to be genuine issues of fact as to how much influence, special access to media, and diminished expectation of privacy attached to the Chief of Podiatry position, the Court concludes that this question is not amenable to summary judgment.[37]  See

---

[37] Beyond any factual disputes about the "inherent attributes" of the Chief of Podiatry position, the Court notes that the allegedly defamatory statements in this case involve the care Franchini provided as a treating podiatrist, not any duties that were unique to the Chief of Podiatry position.  See Kassel, 875 F.2d at 939 (explaining "[t]he inherent attributes of the position" are what separate public officials from private figures who happen to public employees).

<u>Mandel</u>, 456 F.3d at 206–07 (finding public-official question could not be resolved "under the strictures of the summary judgment standard").

Thus, on the record presented, the Court declines to find that Plaintiff is a public official.

## V.   CONCLUSION

For the reasons just given, the Court GRANTS IN PART and DENIES IN PART Defendants' Joint Motion for Summary Judgment (ECF No. 138).  As to Defendant IBD, the Motion is DENIED without prejudice.  As to all other remaining Defendants, the Motion is GRANTED.

In light of this ruling, only the following claims remain pending:  (1) Count IV, which is brought against Defendant IBD, and is currently stayed, and (2) Count V, the misrepresentation claim brought against Defendants Gannett Company, Inc., and Donovan Slack.  This matter shall be set for a status conference before the magistrate judge to determine a process and schedule for resolving these remaining claims.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 3rd day of September, 2021.